IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

UNITED STATES OF AMERICA　　　　:
　　　　　　　　　　　　　　　　　:　Case No. 3:11-CR-58 (CAR)
　　　　　　v.　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:　Filed at _10:46 AM_
WESLEY JOSEPH WINGO, a/k/a　　　:　___2-25___ 20_13_
JOE WINGO, a/k/a PASTOR JOE,　　:
and PJ　　　　　　　　　　　　　　:　DEPUTY CLERK, U.S. DISTRICT COURT
　　　　　　　　　　　　　　　　　:　MIDDLE DISTRICT OF GEORGIA

## BINDING PLEA AGREEMENT PURSUANT TO
## FEDERAL RULE OF CRIMINAL PROCEDURE 11(c)(1)(C)

It is agreed by the United States of America, by and through its undersigned attorneys, and WESLEY JOSEPH WINGO, a/k/a JOE WINGO, a/k/a PASTOR JOE, and PJ, hereinafter referred to as "Defendant," and Defendant's undersigned attorney, as follows:

### (1)

Defendant acknowledges that he has reviewed and discussed the Indictment against him in this matter with Defendant's attorney and that Defendant's attorney has explained to Defendant his understanding of the government's evidence.

### (2)

Defendant understands that he is not required to plead guilty, and that Defendant has the right to plead not guilty and to elect instead to be tried by jury.

Defendant understands that at a jury trial, Defendant would enjoy a presumption of innocence, and that the government would have the burden of proving Defendant's guilt beyond a reasonable doubt. Defendant further understands that he would be entitled to the services of a lawyer at all stages of such a trial. Defendant understands that he would be entitled to confront and to cross-examine the government's proof, and to present witnesses and evidence in Defendant's own behalf. Defendant understands that he would have the right to testify in Defendant's own behalf, but that Defendant could not be compelled to do so. Defendant has discussed these rights with his attorney. Defendant is satisfied with the services of his lawyer. Defendant knowingly and voluntarily waives his right to plead not guilty and to proceed to trial.

The United States Attorney and the Defendant understand and agree that the Court should consider its sentence in light of the advisory Federal Sentencing Guidelines, as explained in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005). Defendant knowingly and voluntarily waives any further objections that Defendant may have based on *Booker*, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and their progeny. So the Defendant agrees that at sentencing the Court may determine any pertinent fact by a preponderance of the evidence and the Court may consider any reliable information, including hearsay. Defendant expressly waives any claim of

2

right to an indictment, trial by jury, and/or proof beyond a reasonable doubt on any factual determinations that pertain to sentencing in this case.

(3)

Defendant being fully cognizant of his rights, and in exchange for the considerations to be made by the United States as set forth in paragraph (4) below, agrees pursuant to Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, as follows:

**(A)**     That Defendant is guilty and will knowingly and voluntarily enter a plea of guilty to Count Forty of the Indictment which charges Defendant with Conspiracy to Commit Money Laundering, in violation of Title 18 U.S.C. 1956(h), in connection with violation of Title 18, United States Code, Section 1957.

**(B)**     That Defendant fully understands that Defendant's plea of guilty as set forth in Subparagraph (A), above, will subject Defendant to a maximum sentence of ten (10) years imprisonment, a maximum fine of $250,000.00, or both, and a term of supervised release of three (3) years. Defendant further acknowledges that the Court is required to impose a mandatory assessment of $100.00.

However, this plea agreement is made pursuant to Rule 11(c)(1)(C), Federal Rules of Criminal Procedure. Defendant and the United States Attorney agree that the appropriate sentencing range for this matter is zero (0) to eighty four (84) months. Defendant and the United States Attorney further agree that the Court

3



should apply the Federal Sentencing Guidelines in determining where the sentence should fall in that range, but in no event shall the Court impose a sentence in excess of eighty four (84) months. Defendant and the United States Attorney agree that this sentencing range, as well as a fine, and a term of supervised release (the amount of fine and the term of supervised release to be determined by the Court) is an appropriate disposition of this case. Thus, the parties jointly request that such a sentence be imposed by the Court.

Defendant understands that if the Court accepts this plea agreement, this joint request will be binding upon the Court. Defendant further understands that if the Court rejects this plea agreement, the Court must do so on the record and in open court. The Court must advise Defendant of the following: (i) inform the parties that the Court rejects the plea agreement; (ii) advise Defendant personally that the Court is not required to follow the plea agreement and give him the opportunity to withdraw the plea; and (iii) advise Defendant personally that if the plea is not withdrawn, the Court may dispose of the case less favorably toward Defendant than the plea agreement contemplated. The government further agrees that should this plea be withdrawn based on the Court notifying the parties that it will not accept the terms of this agreement, the government will not make any use of the statements made by Defendant during the plea colloquy or as stipulated in this agreement in

4

any subsequent trial which might be necessary.

(C)     Defendant acknowledges and understands that the Court is not bound by any estimate of the advisory sentencing range that Defendant may have received from Defendant's counsel, the government, or the Probation Office. Defendant further acknowledges and agrees that Defendant will not be allowed to withdraw his plea because Defendant has received an estimated guideline range from the government, Defendant's counsel, or the Probation Office which is different from the advisory guideline range computed by the Probation Office in the Presentence Report and found by the Court to be the correct advisory guideline range.

(D)     Defendant understands fully and has discussed with Defendant's attorney that the Court will not be able to consider or determine an advisory guideline sentencing range until after a Pre-Sentence Investigative Report has been completed.  Defendant understands and has discussed with his attorney that the Defendant will have the opportunity to review the Pre-Sentence Investigative Report and challenge any facts reported therein.  Defendant understands and has discussed with Defendant's attorney that any objections or challenges by Defendant or Defendant's attorney to the Pre-Sentence Report, the Court's evaluation and rulings on that Report, or the Court's sentence, will not be grounds for withdrawal of the plea of guilty.



(E)   Defendant understands and has discussed with defendant's attorney that after the Court considers the advisory guideline range for this case, the Court will have the discretion to impose a sentence that is more severe or less severe than the advisory guideline range.  Defendant understands that under Federal Rule of Criminal Procedure 11(c)(1)(C) the government and Defendant have agreed that a specific sentencing cap of eighty four (84) months is the appropriate disposition of this case and that this agreement will bind the Court, in the event that the Court accepts this plea agreement.  Defendant understands and agrees that the agreement to this specific sentencing cap is contingent upon the entry of a guilty plea by Defendants Andy and Linda Wingo; however, Defendant pleads guilty and enters into this plea agreement voluntarily and because he is guilty.

(F)   Defendant agrees to provide a check for the mandatory assessment at the time of sentencing.

(G)   Defendant understands that ordinarily Title 18, United States Code, Section 3742, will in certain cases allow for a direct appeal after sentencing followed by the Court of Appeals' limited review of a defendant's sentence.  But once this agreement is accepted and sentence is imposed by the District Court, Defendant, by this agreement, forever waives any right to an appeal or any other Court review of

6



Defendant's sentence, and Defendant's waiver includes any collateral attack on the Court's sentence.

Defendant and the United States Attorney agree that nothing in this plea agreement shall affect the government's opportunity to appeal as set forth in Title 18, United States Code, Section 3742(b).  If, however, the United States Attorney notices an appeal of Defendant's sentence, then Defendant shall have the right to cross-appeal from the sentence.

(H)   Defendant understands that the Government may have various items of biological evidence in its possession in connection with this case that could be subjected to DNA testing.  Biological evidence for this purpose is defined as any sexual assault forensic examination kit and any other evidence that, in the course of the investigation and prosecution of this matter, has been detected and has been identified as semen, blood, saliva, hair, skin tissue, or some other type of biological material.

Defendant further understands that following conviction in this case, he could file a motion with the Court to require DNA testing of any such biological evidence pursuant to 18 U.S.C. § 3600 in an attempt to prove Defendant's innocence. Defendant fully understands this right to have any and all of the biological evidence in this case tested for DNA, has discussed this right with Defendant's counsel, and

7

knowingly and voluntarily waives the right to have such DNA testing performed on the biological evidence in this case.   Defendant fully understands that because Defendant is waiving this right, the biological evidence in this case will likely be destroyed or will otherwise be unavailable for DNA testing in the future.

(I) Defendant understands and has fully discussed with Defendant's attorney, that the Court shall order total restitution in this case pursuant to 18 U.S.C. Section 3663A and that Defendant agrees to pay the restitution ordered by the Court whether to an identifiable victim or the community.

## (4)

In exchange for the consideration set forth in Paragraph (3) above, the United States Attorney for the Middle District of Georgia agrees as follows:

**(A)**   That he will accept the plea of guilty by Defendant as provided in Paragraph (3)(A), above, in full satisfaction of all possible federal criminal charges, known to the United States Attorney at the time of Defendant's guilty plea, which might have been brought solely in this district against Defendant.

**(B)**   That he further agrees, if Defendant cooperates truthfully and completely with the Government, including being debriefed and providing truthful testimony, at any proceeding resulting from or related to Defendant's cooperation, to make the extent of the Defendant's cooperation known to the sentencing court. If

8

Defendant is not completely truthful and candid in his cooperation with the government, Defendant may be subject to prosecution for perjury, false statements, obstruction of justice, and/or any other applicable charge. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" pursuant to 18 U.S.C. Section 3553(e) and/or Section 5K1.1 of the advisory Sentencing Guidelines warranting a government motion at the time of sentencing recommending a downward departure from the advisory guideline range. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure warranting the filing of a motion for reduction of sentence within one year of the imposition of sentence. In either case, Defendant understands that the determination as to whether Defendant has provided "substantial assistance" rests solely with the government. Any good faith efforts on the part of Defendant that do not substantially assist in the investigation or prosecution of another person who has committed a crime will not result in either a motion for downward departure from the advisory guideline range or a Rule 35 motion. In addition, should Defendant fail to cooperate truthfully and completely with the government, or if

9



Defendant engages in any additional criminal conduct, Defendant shall not be entitled to consideration pursuant to this paragraph.

(C)     Pursuant to Section 1B1.8 of the United States Sentencing Guidelines, the Government agrees that any self-incriminating information which was previously unknown to the government and is provided to the Government by Defendant in connection with Defendant's cooperation and as a result of Defendant's plea agreement to cooperate will not be used in determining the advisory guideline range.  Further, the Government agrees not to bring additional charges against Defendant, with the exception of charges resulting from or related to violent criminal activity, as defined in 18 U.S.C. § 924(e)(2)(B)(i), based on any information provided by Defendant in connection with Defendant's cooperation, which information was not known to the government prior to said cooperation. This does not restrict the Government's use of information previously known or independently obtained for such purposes.

(D)     If Defendant affirmatively manifests an acceptance of responsibility as contemplated by the Sentencing Guidelines, the United States Attorney will recommend to the Court that Defendant receive a downward adjustment in the advisory guideline range.  But the decision whether Defendant will receive any sentence reduction for acceptance of responsibility rests within the Court's

10

discretion. The United States expressly reserves its right to furnish to the Court information, if any, showing that Defendant has not accepted responsibility, including, but not limited to, denying his involvement, giving conflicting statements as to his involvement, or engaging in additional criminal conduct including personal use of a controlled substance.

### (5)
### (Criminal Forfeiture)

It is further stipulated that and agreed that during the time of the offense stated in Count Forty of the Indictment, Defendant engaged or attempted to engage, in monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, that is check and wire transfers, such property having been derived from a specified unlawful activity, that is, mail fraud, wire fraud and/or theft from an organization receiving federal funds, and will forfeit a sum of money equal to one million, five hundred and three thousand, two hundred eighty five dollars ($1,503,285), representing the amount of funds that were involved in/or traceable to the commission of the aforesaid violations of Title 18, United States Code, Section 1956(h), in connection with violation of Title 18, United States Code, Section 1957. (hereinafter "subject property").

11

(A)   Defendant hereby forfeits to the United States voluntarily and immediately all of Defendant's right, title, and interest in the subject property which is subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(1) or which are substitute assets thereof.

(B)   Defendant agrees that the subject property reflects a reasonable compromise between the parties for forfeiture purposes concerning the amount of funds involved in/or traceable to the commission of the aforesaid violations of Title 18, United States Code, Section 1956(h), in connection with violation of Title 18, United States Code, Section 1957.

(C)   Defendant agrees to the entry of a preliminary order of forfeiture of the above-described subject property pursuant to Federal Rules of Criminal Procedure 32.2 upon acceptance of Defendant's plea of guilty by the United States District Court, and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he understands that the forfeiture of the subject property is part of the sentence that may be imposed in this case and waives any failure by the court to advise him of this, pursuant to FED. R. CRIM. P. 11(b)(1)(J) at the time of his guilty plea is accepted.

12

(D)   Defendant agrees that the subject property was involved in/or traceable to  the commission of the aforesaid violations of Title 18, United States Code, Section 1957, and in violation of Title 18, United States Code, Section 1956(h), and is subject to forfeiture under Title 18, United States Code, Section 982(a)(1).

(E)   Defendant agrees to identify all assets over which Defendant exercises or exercised control, directly or indirectly, within the past five (5) years, or in which the Defendant has or had during that time any financial interest.  Defendant agrees to take all steps as requested by the United States to obtain from any other parties by any lawful means any records of assets owned at any time by Defendant.  Defendant agrees to forfeit to the United States all of Defendant's interests in any asset of a value of more than $1,000.00 that, within the last five years, Defendant owned, or in which Defendant maintained an interest, the ownership of which the Defendant fails to disclose to the United States in accordance with this agreement.

(F)   Defendant agrees to forfeit all interests in any asset that Defendant currently owns, has previously owned or over which Defendant currently, or has in the past, exercised control, directly or indirectly, and any property Defendant has transferred, as well as any property that is traceable to, derived from, fungible with, or a substitute for property that constitutes the funds involved in the aforementioned offense.

13

(G)     Defendant agrees fully to assist the United States in the forfeiture of the subject property and to take whatever steps are necessary to pass clear title to that property to the United States, including but not limited to, surrendering the subject property to the United States at the time of sentencing, surrender title and execution of any documents necessary to transfer Defendant's interest in any of the above property to the United States, assisting in bringing any assets located outside the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that the property subject to forfeiture is not sold, disbursed, wasted, hidden, or otherwise made unavailable for forfeiture.

(H)     Defendant agrees to waive all interest and not file a claim to the subject property in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal, which may be or has been initiated.

(I)     Defendant agrees to waive Defendant's right to notice of any forfeiture proceeding involving the subject property, and agrees not to file a claim or assist others in filing a claim in any such forfeiture proceeding.

(J)     Defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of the subject property. Defendant knowingly and voluntarily waives all constitutional, legal, and equitable defenses to the forfeiture of the subject property in any proceeding. Defendant agrees to waive any jeopardy defense or

14

claim of double jeopardy, whether constitutional or statutory, and agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of the subject property by the United States, the State of Georgia, or its subdivisions.

(K)     Defendant agrees to make a full and complete disclosure of all assets in which Defendant has any interest or over which Defendant exercises control and those which are held or controlled by a nominee(s). Defendant represents and warrants to the government that Defendant has no direct or indirect interest, whether held in Defendant's name, or in the name of another, in any property or asset that would be subject to forfeiture on the basis of the violations covered by this plea agreement, other than the subject property listed above.     Defendant understands and acknowledges that the government is relying upon Defendant's representation in entering into this plea agreement. If those representations are false or inaccurate in any way, the government may pursue all forfeiture remedies available.

(L)     Defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence. Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon Defendant in

15

addition to forfeiture.

(M)   Defendant agrees to hold harmless, release, and forever discharge the United States, its officers, agents, attorneys, servants, and employees, from any and all actions, causes of actions, suits, proceedings, debts, dues, contracts, judgments, damages, claims, or demands whatsoever in law or equity which Defendant, his successors, or assigns, ever had, now have, or may have, whether known or unknown, in connection with the seizure and forfeiture of the subject property.

(N)   Defendant freely, voluntarily, knowingly, and intelligently waives any right to appeal or collaterally attack any matter in connection with the forfeiture of assets pursuant to this plea agreement.

(6)

Nothing herein limits the sentencing discretion of the Sentencing Court except as outlined in Paragraph 3(B) above.

(7)

This agreement constitutes the entire agreement between Defendant and the United States, and no other promises or inducements have been made, directly or indirectly, by any agent of the United States, including any Assistant United States Attorney, concerning any plea to be entered in this case.  In addition, Defendant states that no person has, directly or indirectly, threatened or coerced him to do or

16

refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

(8)

As an aid to this Court, the United States Attorney and Defendant, by and through defendant's counsel, enter into the following Stipulation of Fact. This stipulation is entered into in good faith with all parties understanding that the stipulation is not binding on the Court. Under U.S.S.G. Policy Statement Section 6B1.4(d), this Court may accept this stipulation as written or in its discretion with the aid of the Pre-Sentence Report determine the facts relevant to sentencing.

Subject to the above paragraph, the United States Attorney and the Defendant stipulate and agree that the following facts are true and would be proven beyond a reasonable doubt at a trial:

A.   **Background**

Angel Food Ministries (AFM), based in Monroe, Walton County, Georgia, within the Athens Division of the Middle District of Georgia, is a nonprofit tax exempt 501(c) organization founded in 1994 by Defendants Joe and Linda Wingo. AFM's primary stated mission is to provide food to the nation's needy at discounted prices. After receiving almost $7 million in a low-interest community facilities direct loan from the United States Department of Agriculture in 2005, AFM purchased a

17

large distribution center in Monroe, Georgia, and used its considerable purchasing power and its tax-exempt status to gain volume discounts from various food vendors, such as Tyson, General Mills, and Perdue. In the process of growing from a local, to a regional, to a national nonprofit organization, AFM utilized churches from around the country, known as host sites, to coordinate the charitable efforts of thousands of volunteers to distribute food to the needy in over forty states, from New York, to California, to Texas.

As an AFM Co-Founder, Defendant Joe Wingo held many senior executive positions at various times, to include President, Chief Operating Officer and Member of the Board of Directors. In these capacities, Defendant Joe Wingo oversaw all of the operations of AFM, and he was intimately involved in all aspects of AFM's financial operations. The fact that AFM was tax exempt, that it was able to purchase in large volume at a discount, and that its distribution network was in large part manned by volunteer labor, resulted in a large amount of annual revenue, an amount well in excess of expenses.

### B.   Improper Expenditures

Defendant Joe Wingo used his position and control over AFM to make several purchases and expenditures for his personal benefit without the knowledge and approval of the AFM Board of Directors. He also permitted other members of

18

his family to do the same on many occasions.  For example, on one such occasion, Defendant Joe Wingo wrote a $65,000 check to himself on an AFM business account for the purchase of a classic car.  The AFM check was deposited into Defendant Joe Wingo's personal account and then Defendant Joe Wingo wrote a personal check to J.P. Muscle Cars in Monroe, Georgia, for $65,000.  The title for this classic car was placed in Defendant Joe Wingo's name.   This vehicle purchase was made without the prior knowledge and approval of the AFM Board of Directors.

On another occasion, Defendant Joe Wingo decided that AFM needed a private jet aircraft to perform its charitable mission of feeding the nation's needy, so he wired $280,000 in AFM funds from an AFM business account to Dove Air for the down payment.  Instead of AFM, the private jet was titled in the name of North Carolina Aviation Leasing, LLC, a company owned by Defendant Joe Wingo and other Wingo family members.  The private jet was then leased back to AFM by way of a "dry lease," an arrangement by which AFM paid for all the expenses of the aircraft, *plus* AFM paid a lease amount to Defendant Joe Wingo, the owner of the private jet, by virtue of AFM monies.

### C.   Notes Receivable and Wingo Family "Bonuses"

In November 2006, when financial auditors reviewed the AFM records, they identified several entries, including payments for housing and medical expenses, as

19

well as personal expenses and purchases made from AFM funds, without authority of the AFM Board of Directors. The financial auditors informed Defendant Joe Wingo that notes receivable must be executed for these numerous items. At that time, Defendant Joe Wingo signed a letter of compliance agreeing that personal expenses could no longer be placed on the AFM American Express cards and pledging that the balances for personal expenses that were already on the AFM American Express Cards must be repaid.

Then, without the prior knowledge or approval of the AFM Board of Directors, Defendant Joe Wingo issued "bonus wages" to the Wingo family members in an effort to eliminate the notes receivable from the AFM books. In addition to the "bonus wages," Defendant Joe Wingo directed AFM to set aside funds to pay the anticipated withholding tax liability for the individual "bonus wages." These year-end "bonuses" were made to correct the bookkeeping entries where the Wingo family members had misapplied funds from AFM to pay for personal expenses.

20



Defendant Joe Wingo issued AFM checks to the Wingo family members and denoted those checks as "bonus wages" as follows:

|  | Check # | Payee | Amount | Amount plus tax | Pay Period |
|---|---|---|---|---|---|
|  | 12744 | Andy Wingo | $200,000.00 | $336,707.61 | 12/16/2006-12/29/2006 |
|  | 12745 | W. W. | $200,000.00 | $335,837.35 | 12/16/2006-12/29/2006 |
|  | 12746 | Linda Wingo | $200,000.00 | $336,973.24 | 12/16/2006-12/29/2006 |
|  | 12747 | L. M. W. | $200,000.00 | $352,493.00 | 12/16/2006-12/29/2006 |
|  | 12748 | Joe Wingo | $72,000.00 | $120,024.30 | 12/16/2006-12/29/2006 |
| Total |  |  | $872,000.00 | $1,482,035.50 |  |

On or about January 4, 2007, Joe Wingo required the other Wingo family members identified in the chart immediately above to issue checks back to AFM in the amount of the "bonus wages" that they had just received in order to correct bookkeeping entries for unauthorized expenditures and loans taken by Joe Wingo and Linda Wingo from the books and records of AFM.

21



AFM deposited the following checks from the various Wingo family members drawn on their personal accounts as follows:

| Check # | Bank Account | Payor | Amount |
|---------|--------------|-------|--------|
| 5812 | Athens First Bank & Trust | Andy Wingo | $200,000.00 |
| 1628 | Athens First Bank & Trust | W. W. | $200,000.00 |
| 3368 | Athens First Bank & Trust | Linda Wingo | $200,000.00 |
| 145 | Regions Banks | L. M. W. | $200,000.00 |
| 3622 | Athens First Bank &Trust | Joe Wingo | $52,777.09 |
| Total | | | $852,777.09 |

After the $852,777.09 amount was re-deposited into the AFM accounts, journal entries were made in the AFM bookkeeping system and one check was issued to Emanuel Praise Church (EPC), another 501(c) tax-exempt corporation associated with AFM, all of which made it appear as though Defendant Joe Wingo and Co-Defendant Linda Wingo had repaid AFM and EPC $852,777.09 for the following unauthorized amounts, including amounts paid for the accumulation of various pieces of real property by LINJOE, LLC, a limited liability corporation solely owned by Defendant Joe Wingo and Co-Defendant Linda Wingo, created in 2006, in order to generate rental income.

22

| Notes Receivable | Amount |
|---|---|
| Wingo Residence | $46,266.92 |
| Loan #10 (classic car) | $65,000.00 |
| Loan #11 (jet aircraft) | $280,000.00 |
| "J/W Social Circle" | $2,280.00 |
| Wesley Joseph Wingo | $174,072.08 |
| LINJOE, LLC, 102 Queens Ln, Good Hope, Georgia | $23,206.04 |
| LINJOE, LLC, 112 Queens Ln, Good Hope, Georgia | $1,609.15 |
| LINJOE, LLC, 203 Queens Ln, Good Hope, Georgia | $1,730.20 |
| LINJOE, LLC, 800 Riverwood Dr, Good Hope, Georgia | $136,612.70 |
| AFM Check to EPC for Joe Wingo loans | $122,000.00 |
| **Total** | **$ 852,777.09** |

These checks, and these series of transactions, were monetary transactions by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000 the money having been derived from a specified unlawful activity that is intentional misapplication of funds from an organization receiving federal funds. The net result of these transfers was a $1,482,035 loss for AFM, equaling $872,000 in "bonus wages" and $610,035 in withholding tax liability.

23



### D.   Political Campaign and AFM Employee "Bonuses"

Defendant Joe Wingo, wanted to provide financial support to a political candidate of his choosing in the 2008 Walton County Sheriff's race. Defendant Joe Wingo, AFM's CEO at that time, knew that IRS regulations prohibited AFM, a nonprofit tax exempt 501(c) organization, from offering any financial support to political candidates or participating in political activity on behalf of political candidates. Nevertheless, Defendant Joe Wingo decided to use AFM funds to support his candidate of choice for Walton County Sheriff, A.Y.

Defendant Joe Wingo did so by issuing "bonuses" from AFM funds to AFM employees. These funds were drawn on AFM's Payroll Account, # XXX0701, at Athens First Bank and Trust:

| Check Date | Check Number | AFM Employee | Amount |
|---|---|---|---|
| April 29, 2008 | 1163 | Employee M. B. | $2,100.00 |
| April 30, 2008 | 1169 | Employee D. W. | $2,100.00 |
| May 09, 2008 | 1191 | Employee A. B. | $2,050.00 |
| May 14, 2008 | 1196 | Employee J. W. | $2,000.00 |
| May 14, 2008 | 1197 | Employee T. P. | $2,000.00 |
| May 14, 2008 | 1198 | Employee G. D. | $2,000.00 |
| May 14, 2008 | 1199 | Employee D. M. | $1,000.00 |
| May 14, 2008 | 1200 | Employee D. B. | $1,000.00 |
| May 14, 2008 | 1201 | Employee M. W. | $1,000.00 |
| May 14, 2008 | 1202 | Employee D. A. | $500.00 |
| May 14, 2008 | 1203 | Employee L. H. | $500.00 |
| May 14, 2008 | 1204 | Employee J. P. | $500.00 |
| May 14, 2008 | 1206 | Employee C. B. | $500.00 |
| May 14, 2008 | 1207 | Employee M. S. | $500.00 |

| May 14, 2008 | 1208 | Employee W. A. | $500.00 |
|---|---|---|---|
| May 14, 2008 | 1209 | Employee R. E. | $500.00 |
| May 14, 2008 | 1210 | Employee B. T. | $1,000.00 |
| May 14, 2008 | 1211 | Employee T. B. | $500.00 |
| May 14, 2008 | 1214 | Employee M. S. | $1,000.00 |
| Total | | | $21,250.00 |

The "bonuses" were not issued with the prior knowledge or approval of the

AFM Board of Directors.    Instead, Defendant Joe Wingo ~~directed~~ *encouraged* the AFM

employees who received these "bonuses" to make personal contributions to A.Y.'s

political campaign in the amount of these "bonuses" from their own private

accounts.    Issuance of the "bonuses" represents an intentional misapplication of

funds, without authority, from an organization receiving federal funds.

The following deposits were made into the Campaign Fund for A. Y. account

#XXX3853 at the National Bank of Walton County:

| Date of Deposit | Check deposited | Amount |
|---|---|---|
| 4/08/2008 | Employee M. S. | $1,000.00 |
| 4/26/2008 | Employee M. B. | $2,000.00 |
| 4/26/2008 | Employee D. W. | $2,000.00 |
| 5/08/2008 | Employee A. B. | $2,000.00 |
| 5/08/2008 | Employee W. T. | $500.00 |
| 5/15/2008 | Employee D. M. | $1,000.00 |
| 5/22/2008 | Employee D. B. | $1,000.00 |
| 5/22/2008 | Employee J. P. | $500.00 |
| 5/22/2008 | Employee D. P. | $1,000.00 |
| 5/22/2008 | Employee W. T. | $1,000.00 |
| 5/22/2008 | Employee R. E. | $500.00 |
| 5/22/2008 | Employee C. B. | $500.00 |

25



| 5/22/2008 | Employee J. A. | $500.00 |
|-----------|----------------|---------|
| 5/22/2008 | Employee M. W. | $1,000.00 |
| 5/22/2008 | Employee G. D. | $2,000.00 |
| 5/22/2008 | Employee W. A. | $500.00 |
| 5/22/2008 | Employee L. H. | $500.00 |
| 5/22/2008 | Employee S. D. | $1,000.00 |
| 5/22/2008 | Employee J. W. | $2,000.00 |
| Total | | $20,500.00 |

On or about May 15, 2008, Joe Wingo, then the CEO of AFM, hosted a barbeque at the AFM Airport Hangar for candidate A. Y., other local cnadidates, and various employees of AFM. The AFM employees presented their donation checks to the candidate at that time. This was all done without the prior approval of the Board of Directors of AFM and these transactions resulted in an intentional misapplication of property of AFM. Without denying that the funds were misapplied, Defendant Joe Wingo reimbursed AFM for these funds.

E.   **Summary**

Defendant Joe Wingo, Co-Founder, and former President, Chief Operating Officer and Member of the Board of Directors of AFM, now agrees and stipulates that the government can prove beyond a reasonable doubt all of the facts, as alleged, in this Stipulation of Fact. The parties stipulate and agree that the amount of the laundered funds involving the Notes Receivable-Wingo Family "Bonuses" is

26



approximately $1,482,035 and involving the Political Campaign-AFM Employees "Bonuses" is approximately $21,250, for a total stipulated amount of $1,503,285.

(9)

## ACCEPTANCE OF PLEA AGREEMENT

Defendant understands and has fully discussed with his attorney that this agreement shall become effective only upon the Court's acceptance of this agreement and the Court's acceptance of the plea of guilty by the Defendant.

SO AGREED, this __25th__ day of February, 2013.

MICHAEL J. MOORE
UNITED STATES ATTORNEY

BY: _____

Sharon T. Ratley
Assistant United States Attorney
Georgia Bar No. 703150

BY: _____

Danial E. Bennett
Assistant United States Attorney
Georgia Bar No. 052683

27



I, WESLEY JOSEPH WINGO, a/k/a JOE WINGO, a/k/a PASTOR JOE, and PJ have read this agreement and had this agreement read to me by my attorney, I have discussed this agreement with my attorney and I fully understand it and agree to its terms.

WESLEY JOSEPH WINGO, a/k/a
JOE WINGO, a/k/a
PASTOR JOE, and
PJ
DEFENDANT

I, MICHAEL C. DANIEL, attorney for Defendant WESLEY JOSEPH WINGO, a/k/a JOE WINGO, a/k/a PASTOR JOE, and PJ, have explained the Indictment and the government's evidence received through discovery and my investigation of the charge to Defendant. I believe Defendant understands the charges against him and the evidence that would be presented against him at a trial. I have read this agreement, have been given a copy of it for my file, and have explained it to Defendant. To the best of my knowledge and belief, Defendant understands this agreement.

MICHAEL C. DANIEL, ESQ.
ATTORNEY FOR DEFENDANT

28